Estate of Isaac W. Baldwin, Deceased, Florence E. Baldwin and George A. Baldwin, Executors v. Commissioner.
Estate of Baldwin v. Commissioner
Docket No. 9446.
United States Tax Court
T.C. Memo 1961-89; 1961 Tax Ct. Memo LEXIS 263; 20 T.C.M. (CCH) 399; T.C.M. (RIA) 61089; March 29, 1961
*263 I. Arithmetic mistake in Issue 25 corrected. II. Value of cause of action in petitioner's favor redetermined (Issue 12). Allen H. Gardner, Esq., for the petitioner. Albert J. O'Connor, Esq., for the respondent. FORRESTER
Supplemental Memorandum Findings of Fact and Opinion FORRESTER, Judge: Following the filing of the Memorandum Findings of Fact and Opinion in this case (T.C. Memo. 1959-203), petitioner has filed, inter alia, the following motions: I. As to Issue 25 of said opinion, to give arithmetic effect to a conforming amendment, and II. As to Issue 12 of said opinion, to reopen the record to receive the testimony of George A. Baldwin as to the value of a certain cause of action. Such motions were granted. We have considered the record and have heard such testimony. I. As to Issue 25, our aforesaid opinion allowed petitioner a deduction of $1,479.07, that figure being half of nine improvement liens "aggregating at least the claimed total of $2,958.15." Petitioner has pointed out that proof disclosed a total value of $3,805.90 of these nine liens and that a conforming amendment to the petition has been made. Respondent concedes the above but *264 argues that the point is moot since any increase in the deduction allowed here would be offset by a corresponding decrease in the amount deductible under Issue 29 of our aforesaid prior opinion. We disagree with respondent's position. Under Issue 29 petitioner was allowed as an expense of administration those amounts consciously paid for G. Daniel Baldwin's cooperation, and the record demonstrates that at that time petitioner was unaware of this arithmetic mistake. We hold therefore, that the liens in question totaled $3,805.90 instead of $2,958.15, and that the allowable deduction under said Issue 25 is $1,902.95 instead of $1,479.07. II. As to Issue 12 of our aforesaid prior opinion: Supplemental Findings of Fact The findings of fact as originally filed, to the extent not modified by our findings herein, are incorporated by this reference. For purposes of clarity, we shall restate pertinent portions of these facts. Decedent died May 9, 1941, a resident of the Commonwealth of Pennsylvania. Decedent (hereinafter called "Isaac") and his brother, G. Daniel Baldwin (hereinafter called "G. Daniel"), carried on a real estate business in Erie, Pennsylvania, as partners, doing business *265 under the firm name of Baldwin Brothers until said partnership was terminated by a 1940 agreement referred to below. Under the various partnership agreements between the two brothers it was provided that partnership real estate should be "held in the names of the individual partners, each party to have and carry in his name such proportionate part in valuation of the firm real estate as his share or investment is of the whole capital of the said partnership." Isaac's brother, G. Daniel, took charge of the financial end of the business. He was in charge of purchase of land, sales of houses, legal work, and maintenance of records. Isaac was in charge of construction, hired and fired men, designed the buildings, and purchased materials. G. Daniel had a strong, overpowering personality, and dominated almost everyone with whom he came in contact. Isaac was several years younger, and especially susceptible to domination by G. Daniel. Almost without exception, he yielded to G. Daniel in partnership matters. In addition, G. Daniel's control over Isaac extended to personal and family matters, and was so complete that he dictated what Isaac's children should do in purely personal affairs. *266 The partnership's extensive real properties were held in the individual names of Isaac and G. Daniel. Their agreement called for each of them to hold in his name partnership real estate in proportion to his capital investment, and there were many property transfers between them to cause their respective individual holdings to conform thereto. Isaac and his wife, Florence, one of the co-executors herein, immediately upon their marriage in June of 1911, executed a power of attorney in favor of G. Daniel. On December 13, 1911, Isaac and Florence executed another power of attorney authorizing G. Daniel to collect and sue for all sums of money payable to them, to give discharges for all such collections, to compromise all such claims, to release mortgages due them, to lease, sell, and convey realty upon such terms as he should see fit, to borrow money on their names and execute evidences of indebtedness therefor, and to perform other specified acts. Under this power, G. Daniel transferred many properties out of the name of the decedent and performed other acts until Isaac's death. In the latter part of 1935 or early in 1936 G. Daniel became critically ill and was hospitalized for *267 some time. As a result, he was unable to perform his partnership duties for a year or more, or until about the spring of 1937. During this period, Isaac was in complete charge of all phases of the business, including those which had previously been performed by G. Daniel alone. After his illness and as a result of his physical condition and its aggravation due to his disregard of medical advice, G. Daniel became increasingly disagreeable and uncompromising. Whereas he and Isaac had previously gotten along fairly well, in spite of G. Daniel's domination and criticisms, increasing friction now began to develop between them. During the period of G. Daniel's incapacity, Isaac observed various aspects of G. Daniel's partnership activities which he did not like. Things that he observed, of which he had been previously unaware because of the limitation of his activity to the construction phase of the business, reduced his confidence in the soundness of some of G. Daniel's business policies. To an even greater degree, he lost confidence in G. Daniel's honesty and fairness, especially where he, Isaac, was concerned. Owing to all these factors, from the time of G. Daniel's resumption of *268 active participation in the business in the early part of 1937, relations between the brothers grew steadily worse. Beginning at some undisclosed time, and with noticeable effects at least as early as the fall of 1938, Isaac suffered from an incapacitating nervous and mental ailment due to his affliction some years earlier with Parkinson's disease. By reason thereof, he was ordered by his physician to take a rest and vacation in Florida, for which he began to prepare no later than the latter part of 1938. He was never able at any subsequent time to resume active participation in partnership affairs. Isaac's physical condition was such that he was obliged to avoid arguments of any kind with G. Daniel. G. Daniel took advantage of this circumstance and of Isaac's general weakness and subordination in dealing with him and thereby secured the execution by Isaac of a series of unconscionable agreements whereby divisions of real estate (purportedly in pursuance of the aforementioned partnership agreements) were made. G. Daniel was also able, by virtue of his strong power over Issac and Isaac's weakened condition, to have Isaac assume one-half of all partnership indebtedness (rather than *269 only the lesser liability on Isaac's properties as previously agreed). In 1940 G. Daniel was also able to secure an inherently unfair agreement terminating the partnership and settling all rights between the parties. These agreements also made G. Daniel the manager of most of Isaac's real estate. An annual accounting was supposed to be made by G. Daniel on behalf of these properties. Further details of these and subsequent agreements are not deemed necessary. These agreements were for the most part prepared by Clarence T. Bryan who had long been an attorney for the entire Baldwin family. George A. Baldwin (hereinafter called "George") and Florence E. Baldwin, the son and wife, respectively, of Isaac were named executors of Isaac's estate. In reviewing the various contracts possessed by the estate they became disturbed by the agreements which G. Daniel had coerced Isaac into signing. They sought the advice of Bryan (whom Isaac's will had requested as attorney for his estate). Bryan was basically interested in encouraging an amicable settlement of grievances between the two parties and would not recommend that Isaac's executors institute court action to upset the various agreements. *270 George accepted this advice at the outset but soon he became angry at G. Daniel's continued animosity and unwillingness to help him in settling Isaac's estate. G. Daniel's attitude also made it very difficult for the executors to secure the necessary data to reach a fair settlement of the estate's various Federal tax matters. G. Daniel even went to the extreme of forcing a later agreement dated October 1, 1941, whereby Isaac's estate would make further transfers to him to "buy his cooperation" in these matters. George was sometime thereafter referred to an attorney named Washabaugh who had been eminently successful in unrelated litigation against G. Daniel. George explained the details of the various agreements to Washabaugh who expressed great enthusiasm in the potentialities of a suit seeking to set aside these agreements and to obtain other affirmative relief from G. Daniel. George then hired Washabaugh to file suit because of Bryan's rather ambiguous position and his reluctance to see the family dispute carried through the courts. Bryan was sincere in his attitude. He also believed, as did George, that with an adversary so litigious and pertinacious as G. Daniel, any court *271 fight would be long, expensive and frustrating with doubtful chances of success. However, suit was instituted by Washabaugh in December 1944 on behalf of Isaac's estate and related parties as well as George and Florence and others individually, in the Court of Common Pleas, Erie County, Pennsylvania, against G. Daniel and other nominal parties. Bryan did not participate in the suit but cooperated with Washabaugh by turning the relevant papers over to him. The action was in equity and was based largely upon acts of fraud and breach of trust allegedly committed during decedent's lifetime, which acts were discovered by the executors in the marshalling and reduction to possession of the assets of the estate and the ascertainment of estate and inheritance tax liabilities, all in the ordinary course of administration. It was also alleged that fraudulent conduct was practiced by G. Daniel against the executors after Isaac's death. The action sought to recover the value of property alleged to have been taken from the decedent by G. Daniel through breach of trust and fraud in operating the partnership between Isaac and G. Daniel and in managing the property of Isaac and of the complainants; *272 to set aside all agreements and accountings between Isaac and G. Daniel; to set aside all conveyances by Isaac to G. Daniel; to secure from G. Daniel an accounting of all partnership properties and transactions and of G. Daniel's property management; and to have the defendants declared constructive trustees of all properties found to belong to any of the complainants. In November of 1946, while this cause of action was pending, G. Daniel Baldwin died at the age of 70. J. Robert Baldwin, the natural son of Isaac, natural brother of George, and adopted son of G. Daniel, was named executor of G. Daniel's estate. He had none of the rancor or bitterness of G. Daniel (nor was he so stubborn) and the circumstances here narrated had well acquainted him with the evils of prolonged intra-family disputes. Thus he was very amenable to a settlement of the suit. Thereafter, on February 26, 1947, an agreement (hereinafter called the "Compromise Agreement") settling the cause of action referred to above and all claims between the two groups was entered into. The Compromise Agreement provided for certain property transfers to the Isaac W. Baldwin Group. The agreement also provided that the execution *273 of the agreement should constitute a complete and absolute settlement of all disputed issues between every member of each group; and that all pending suits by any member of one group against any member of another group should be immediately dismissed with prejudice. The Compromise Agreement also contained an agreement by the G. Daniel Baldwin Group to furnish information and afford access to records showing the disposition made by G. Daniel of all income which he had collected through May 9, 1941, from properties managed by G. Daniel and purportedly owned by Isaac's children. Certain other provisions of a non-compensatory character were set forth whereby, principally, one or both groups agreed to perform certain acts of courtesy or reciprocity. The benefits of the settlement extended to the various members of decedent's family individually as well as to the estate and trust under his will. A number of the provisions in the Compromise Agreement had no material or fair market value. The fair market value on February 26, 1947, of the several pieces of real estate which were to be conveyed by the G. Daniel Baldwin Group to the Isaac W. Baldwin Group, or its (nominees), was $87,400. *274 After G. Daniel's death Bryan became attorney of record for his estate and did not represent Isaac's estate in these proceedings. Bryan was instrumental in securing the above mentioned settlement, acting primarily in the role of mediator between the two divided factions both of which he had represented previously. While G. Daniel's death bettered the plaintiffs' chances of recovery by removing a rather formidable opponent from their path, it also hurt their position because it brought into operation certain restrictive rules of evidence which made the claim more difficult to establish. A good cause of action in Isaac's favor existed against G. Daniel on the date of the former's death. Supplemental Opinion as to Issue 12 We first deal with respondent's argument that George, since he was not an attorney and did not regularly trade in lawsuits of this nature, was incompetent to express his opinion concerning the value of this cause of action. (George's opinion was that it was valueless on May 9, 1941.) We feel that respondent's objection is more properly addressed to the weight to be accorded to George's testimony than to its admissibility, for, as we interpret George's testimony, *275 it is not intended to express a belief as to the technical merits of the cause of action but rather it was introduced to familiarize us with some of the circumstances casting light upon those many intangibles which inevitably influence the prospects for success in any lawsuit and are of even more crucial significance in evaluating litigation in which personalities and family bickering play so vital a role. Viewing the testimony in the light of the purpose of its offer we apply the established principle that any witness with special knowledge of such circumstances which might affect value is competent to testify. Montana Railway Co. v. Warren, 137 U.S. 348 (1890). Where, as here, the court is in need of enlightenment to enable it to ascertain the value of such an unusual claim it would seem that, in the interests of justice, the rule requiring acquaintance with the facts by the witness should be liberally applied. Experience in evaluating similar claims ought not to be considered a prerequisite where the witness is familiar with the underlying facts. Ruud v. United States, 256 F. 460 (C.A. 9, 1958); United States v. Alker, 260 F. 2d 135, 155-156 *276 (C.A. 3, 1958). Here it is difficult to imagine anyone who possesses greater familarity with the various circumstances surrounding this lawsuit than does George. He was not only the son of Isaac but also the nephew of G. Daniel. He had worked for both of them and had been present at the time of the events leading to the agreements which the suit endeavored to upset. Turning now to the substance of George's testimony, petitioner seeks to establish thereby that we must afford almost conclusive significance to Bryan's earlier opinion that the claim was valueless at Isaac's death. For, George testified, in effect, that Bryan was loyal and aggressive in protecting the rights of petitioner against G. Daniel. From this we are asked to infer that therefore Bryan would have advised the institution of suit had he thought petitioner's claim to have any merit at all. This was probably George's honest belief and we have no reason to suppose that his confidence was misplaced. Nevertheless, we do not feel that this amounts to proof that the claim was valueless. For, the record discloses that Bryan encouraged an out-of-court settlement in petitioner's favor and acted essentially as an arbiter. *277 Thus, we attribute his reluctance to file suit more to his desire to promote family harmony than to his belief that there was no merit in petitioner's claim. Nor do we understand petitioner to challenge our finding that a valid cause of action in Isaac's favor existed at his death. It is not at all unusual for a trusted legal adviser who has had a long and close association with a family group to discourage costly litigation by competing heirs. We thus adhere to our original view that while Bryan's testimony ought not to be totally disregarded, we cannot consider it as completely objective. We must thus search the record further for evidence of a more disinterested nature. Petitioner would have us accept George's testimony to the effect that the claim was unsalable in the Erie community; that owing to G. Daniel's reputation for open hostility and litigiousness, no investor would risk more than a nominal sum in buying a lawsuit so fraught with uncertainties. As a practical matter this may be so, for strangers are generally quite reluctant to interfere in family squabbles. In income tax cases the impossibility of realizing any amount approaching intrinsic value or a fair price (i. *278 e., the absence of a "fair market") for an asset received will permit the conclusion that such asset has no fair market value. Helvering v. Walbridge, 70 F. 2d 683 (C.A. 2, 1934), affirming a Memorandum Opinion of this Court, certiorari denied 293 U.S. 594; Helvering v. Tex-Penn Co., 300 U.S. 481 (1937); Stonewall J. Jackson B.T.A. 1004 (1938); Gould Securities Co. v. United States, 96 F. 2d 780 (C.A. 2, 1938). In these cases, however, it is important to bear in mind that when we find no value for the asset received, we are not completely refusing to recognize a gain or loss but are simply postponing such recognition until a time when a more reliable and realistic determination is possible. Stonewall J. Jackson, supra, at p. 1013. However, in estate tax cases no such postponement is possible and if the tax is not assessed now on a value determined (however imprecisely), the tax is forever lost. This is a difference which the writers have recognized, see Note, 60 Harv. L. Rev. 123, 131 (1936); Paul, Federal Estate and Gift Taxation, section 18.02 (1942); Hughes, The Federal Death Taxes, pp. 259-264 (1938), and which has *279 been significant in court decisions, Burnet v. Logan, 283 U.S. 404, 412-413 (1931). See also R. E. Wyche, 36 B.T.A. 414, 421 (1937). Cf. Cecil H. Gamble, Executor, 33 B.T.A. 94, 99-100 (1935), affd. 101 F. 2d 565 (C.A. 6, 1939), certiorari denied 306 U.S. 664. The necessity for determining value here is thus much akin to that involved in eminent domain proceedings. Furthermore, in such a predicament we are justified in assuming the existence of a "hypothetical market" where imaginary sales might take place. See Houghton v. Commissioner, 71 F. 2d 656 (C.A. 2, 1934), and cases there cited. The impossibility of marketing a claim does not mean that a valuation will not be made or that the valuation will be zero. It thus strikes us that this is one of those innumerable situations where the finder-of fact simply is obliged to do the best he can with the evidence available and arrive at a valuation as fair as possible. We cannot, from the evidence, conclude that the claim was valueless (whether or not it had a fair market value). On the other hand we do regard George's testimony (and particularly that as to *280 the unmarketability of the claim) as important because it sheds light upon our previous determination of value and convinces us that our original appraisal was too high. Petitioner cautions that we must not confuse the ultimate 1947 recovery with the date of death value, some 6 years earlier. We agree that the former is a rather weak indication of the latter. Ithaca Trust Co. v. United States, 279 U.S. 151 (1929). Be that as it may, we still believe that it is highly relevant that an event after Isaac's death tended to decrease the amount of recovery which his estate ultimately obtained. Such circumstance was G. Daniel's death pendente lite and its consequent adverse effect upon the admission of evidence favorable to the plaintiffs. Thus we consider this event as, at least to some extent, counterbalancing those circumstances which tended to increase the recovery - including the fact that after G. Daniel's death petitioner was able to bargain with a more reasonable opponent (J. Robert). We are also aware that George's renewed enthusiasm for the litigation (after he had first believed it to be hopeless) was due, at least in part, to Washabaugh's apparently contagious *281 excitement over the suit. On this point we further bear in mind that Washabaugh's eagerness to establish his reputation in Erie colored his appraisal of the suit. Nor do we overlook the fact that anger and resentment (rather than a reflected appraisal of the merits) prompted George to continue the suit. Nevertheless, as we pointed out above, a claim may have value even though parties are reluctant to pursue it. We have thus weighed all the evidence in both directions, have reconsidered our original opinion especially in view of the useful information which George's testimony adds to our understanding of the rather involved facts, and have concluded that the value of this claim against G. Daniel at Isaac's death was $60,000. Decision will be entered under Rule 50.