AMERICAN NATIONAL BANK & TRUST COMPANY, not personally, but as Executor of the Estate of Robert C. Usher, Deceased, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 78–1136.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1978.

Decided Feb. 28, 1979.

---

Roger B. Harris, Altheimer & Gray, Chicago, Ill., for plaintiff-appellant.

Ronald A. Dweck, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before SWYGERT and SPRECHER, Circuit Judges, and GRANT, Senior District Judge.*

SPRECHER, Circuit Judge.

The issue raised by this appeal is whether the penalty for the late-filing of an estate tax return after a substantial recovery on a contested insurance claim should be based on the value of the claim at death or on the amount of the claim ultimately recovered. We hold that the value at the date of death controls and remand to the district court for a determination of that value necessary to establish the refund due to the taxpayer.

I

On January 23, 1967, Robert C. Usher was killed when the automobile he was driving was struck by a train. An eyewitness to the accident reported that Mr. Usher had driven onto the train tracks, at which the warning bells were ringing, passing a car which was awaiting the approaching train. Mr. Usher then backed off the tracks, drove on the tracks, backed off again, and finally drove on once more, whereupon he was struck by the train. Beyond the circumstances of the collision itself, there were other factors suggesting that Mr. Usher had committed suicide. Several months before his death, it had been revealed that Mr. Usher had embezzled a substantial amount of money from a corporation and that he was unable to meet corporate demands to repay the money. Further, within one month of his death, Mr. Usher applied for and obtained binders for $450,000 of accidental death insurance. One month before that he had obtained a binder for $500,000 of accidental death insurance. Combining these amounts with other amounts obtained the year prior to his death, Mr. Usher was covered with $200,000 in life insurance and $1,150,000 in accidental death insurance.

* Senior District Judge Robert A. Grant, United States District Court for the Northern District of Indiana, is sitting by designation.

All the insurers refused payment on these policies on the basis of suicide exclusions, material misrepresentations by the insured, and technical insufficiencies of the binders. As a result, the executor brought suit against the insurance carriers in district court on July 24, 1967. This suit had not been resolved by April 23, 1968, the date on which the return was required to have been filed. The executor requested and received an extension to October 23, 1968. However, no return was filed by that time, and a return was ultimately filed on April 3, 1970, after a notice from the IRS. In that return the executor listed the value of the accidental death insurance claims as zero.

In 1972 the accidental death insurance claims were tried, and a verdict was obtained on behalf of the estate for $1,000,000. This recovery was thereupon reported to the IRS which then assessed an additional tax of $100,693.29 and a late filing penalty of 25 percent of that amount, or $25,173.32.

The executor paid the tax and penalty and filed a claim for a refund of the penalty with the IRS. When the IRS denied this refund, the instant action was filed. At trial the executor contended that the pendency of the insurance claims constituted reasonable cause for the failure to file a timely return, thereby exempting the estate from the 25 percent penalty. A jury returned a verdict in favor of the United States.

■ The executor did not contest or appeal the jury finding that no reasonable cause existed to exempt him completely from the penalty. Instead, the executor appealed from the trial court's disposition of the executor's post-trial motion dealing with the computation of the 25 percent penalty. The executor claimed that the 25 percent penalty should be computed on the basis of the value of the claims at the date of death, which might have been either minimal or non-existent, and should not be computed on the basis of the amount ultimately recovered. The IRS replied by contending that this argument was foreclosed by the executor's failure to give reasonable notice of this argument in its refund claim and that the amount upon which the penalty was to be computed was the amount of insurance proceeds "receivable" by the estate. The district court found that adequate notice had been given to preserve the executor's argument as to the amount of the penalty,[1] but that the amount was cor-

1. The government has continued to press before this court the argument rejected by the District Court, *viz.*, that insufficient notice of this claim was given in the refund application. Section 7422(a) of the Code provides that "[n]o suit [for refund] . . . shall be maintained . . . until a claim for refund or credit has been duly filed with the Secretary . . . according to . . . the regulations of the Secretary . . . ." The relevant regulation, Treas.Reg. § 301.6402–2(b)(1), provides:

No refund or credit will be allowed . . . except upon one or more of the grounds set forth in a claim filed. . . . The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof.

Relying on these provisions, the government argues that since the refund claim only asserted the existence of a reasonable cause for failure to file, the plaintiff is now foreclosed from seeking a refund of the penalty on the basis that it was improperly computed.

The refund claim, although only directly asserting reasonable cause for delay, stated in the first paragraph that "the assets in which the decedent had an interest were, in fact, of nomi-

nal value and, in any event, would have resulted in a no-tax liability had a Federal Estate Tax return been timely filed." We uphold the district court's determination that this was sufficient notice. The purpose of the statute and regulations is to allow the IRS to make a reasonable and intelligent investigation and evaluation of the taxpayer's claim. Accordingly there is substantial authority that these regulations do not require the strictness of common-law pleading or criminal indictment but only require that the statement of facts be reasonably sufficient to make the Commissioner aware of the nature of the claims; the specific legal formulations of these claims need not be made. See *Scovill Manufacturing Co. v. Fitzpatrick*, 215 F.2d 567 (2d Cir. 1954); *Ford v. United States*, 67–2 T.C. ¶ 9546 (W.D.Ky. 1967), aff'd, 402 F.2d 791 (6th Cir. 1968); *National Forge & Ordnance Co. v. United States*, 151 F.Supp. 937, 139 Ct.Cl. 204 (1957); *T. J. West Co., Ltd. v. Rogan*, 54 F.Supp. 460, 461 (S.D.Cal.1944) ("I know of no principle . . . which would warrant us in penalizing a taxpayer . . . because, although he had placed all the facts before the Commissioner, he drew . . . different legal conclusions from these

rectly computed on the basis of the amount receivable. The plaintiff now appeals this latter finding.

## II

The penalty provision involved here is section 6651(a)(1) of the Internal Revenue Code which provides that

> In case of failure . . . to file any return . . . on the date prescribed therefor . . . there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than one month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.

The controlling phrase here is "the amount required to be shown as tax on such return." That amount is computed on the basis of the "value of the gross estate" reduced by certain deductions provided in I.R.C. §§ 2051–56 and by certain credits permitted by I.R.C. §§ 2010–16. *See* I.R.C. § 2051. The "value of the gross estate" is defined generally by § 2031(a) as "the value *at the time of* . . . [the decedent's] *death* of all property, real or personal, tangible or intangible, wherever situated" (emphasis supplied). Although section 2031(a) only clarifies the time scheme of the valuation, the regulations to that section detail the concept of valuation. Section 20.2031–1(b) of the regulations provide that value is the "fair market value at the time of the decedent's death" and that the fair market value is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."

Applying these provisions alone to the instant case, it is clear that the assessed penalty will depend on the value of the insurance claims at the time of death and that any subsequent recovery is irrelevant. The courts which have considered the valuation of contingent claims have been uniform in this result. In *Duffield v. United States,* 136 F.Supp. 944 (E.D.Pa.1955), one of the assets in the deceased attorney's estate was a contingent fee contract relating to his representation of certain heirs in a will contest unresolved at the time of the attorney's death. Subsequent to the attorney's death, but before the estate tax return was filed, the client-heirs received the bulk of the multi-million dollar contested estate and as a result the attorney's estate received almost one million dollars in fees. When the estate tax return was filed, the executor listed the value of the contingent fee contracts as zero. The IRS audited the return, valued the contracts as equal to the amounts ultimately received and assessed the additional taxes. In the executor's refund suit, Circuit (then District) Judge Van Dusen rejected the executor's argument that the contingent character of the contracts precluded them from having any value whatsoever. However, the court also rejected the IRS's contention that the full amount of the ultimate proceeds would be taxable:

> The court agrees with counsel for plaintiff's contention that the value of any rights attached to these contingent fee contracts must be determined as of the time of decedent's death and defendant's contention in the answer that these contracts were worth the full amount ultimately received would seem most unlikely.

136 F.Supp. at 947–48 n.11.[2]

The IRS seeks to avoid this result by relying on Section 2042 of the Code and its

---

facts."). Clearly the Commissioner was given sufficient notice of this claim by the taxpayer's assertion that the claims had no value at the time of death, particularly where the IRS had been consistently provided with updated information as to the claims and had conducted an audit of the estate. *Ford v. United States,* 67–2 T.C. at 9546.

**2.** *See also Schnorbach v. Kavanagh,* 102 F.Supp. 828, 838 (W.D.Mich.1951) (involving decedent's distribution rights in liquidation proceeding where, after date of death, buyer found for asset who was willing to pay more than appraised value) ("The fact that the Schnorbach estate eventually realized $1,500 from this account receivable may be considered, but un-

regulations thereunder. Section 2042 provides:

The value of the gross estate shall include the value of all property—

(1) RECEIVABLE BY THE EXECUTOR.—To the extent of the amount receivable by the executor as insurance under policies on the life of the decedent.

(2) RECEIVABLE BY OTHER BENEFICIARIES.—To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. For purposes of the preceding sentence, the term "incident of ownership" includes a reversionary interest (whether arising by the express terms of the policy or other instrument or by operation of law) only if the value of such reversionary interest exceeded 5 percent of the value of the policy immediately before the death of the decedent. As used in this paragraph, the term "reversionary interest" includes a possibility that the policy, or the proceeds of the policy, may return to the decedent or his estate, or may be subject to power of disposition by him. The value of a reversionary interest at any time shall be determined (without regard to the fact of the decedent's death) by usual methods of valuation, including the use of tables of mortality and actuarial principles, pursuant to regulations prescribed by the Secretary [or his delegate]. In determining the value of a possibility that the policy or proceeds thereof may be subject to a power of disposition by the decedent, such possibility shall be valued as if it were a possibility that such policy or proceeds may return to the decedent or his estate.

The Regulations under this section provide that "the amount to be included in the gross estate under section 2042 is the full amount receivable under the policy." Treas.Reg. § 20.2042–1(a)(3). Based on these provisions the government argues that notwithstanding the contingency of the receipt of proceeds, the estate is required to report and pay tax on the amounts receivable under the policies. If we accept such a position, then it inevitably follows that the estate here was required to have listed the $1.15 million receivable on the insurance when it filed its return and

der all the facts and circumstances it is of little evidentiary value in determining the fair market value on the valuation date."); *Estate of Baldwin,* 20 T.C.M. (CCH) 399, 404 (1961) ("Petitioner cautions that we must not confuse the ultimate 1947 recovery with the date of death value [of the cause of action], some 6 years earlier. We agree that the former is a rather weak indication of the latter."); *Estate of Skinner,* 13 B.T.A. 846, 848 (1928) (upholding $1 valuation of claim against utilities for refund of main line development deposit) ("Enforcement . . . was contingent upon . . . use of gas and water by customers residing upon the development. . . . At the time of death, it would have been impossible to determine what value, if any, attached to such contingent claims."). *See generally Burnet v. Logan,* 283 U.S. 404, 413, 51 S.Ct. 550, 553, 75 L.Ed. 1143 (1931) ("The value was assumed . . . and its transfer was so taxed. Some valuation—speculative or otherwise—was necessary in order to close the estate. . . . [I]t may yield more.").

The weak probative force of subsequent events in the determination of date of death value of assets in the estate is implicit in the concept of value itself. Two conceptions of value are possible. First it is apparent that an asset always has some theoretical, underlying value which is revealed or made apparent by subsequent events. For example, an unsigned painting by Botticelli languishing in a second hand art shop with a minimal price tag always had the same inherent value which it acquires when the creator of the painting is later discovered. In a second sense, however, value is a practical process, always changing in accord with the price that it will yield on the market at a given time. In this sense, the undiscovered Botticelli has a value far less than its "inherent" value. The Code and the Regulations clearly enshrine this second sense of value (See the market test of Treas.Reg. 20.2031–1(b)), and we are thus in accord with the statements of the previously cited authorities that subsequent events have little worth in determining prior value.

thus the penalty would be based on that amount as well.

We note initially that we are loathe to accept a reading of the statute which entails such a harsh, and seemingly irrational taxing policy. Such a reading of the statute would, for example, require an estate to pay tax on the full amount receivable even in those cases where because, for example, of the insurance company's insolvency or the fraudulent activity of an insured, *no* recovery is ever made. No specific provision exists in the Code or Regulations to provide for recovery of taxes paid in such a situation; and even if the general refund provisions[3] were interpreted to reach such a result,[4] the estate would still bear the potentially insurmountable burden of advancing money to pay taxes on funds not yet in the estate.[5]

An examination of the statute does not reveal any clear legislative intent to reach such a result. The language of the statute provides no elaboration of the concept of value itself; it merely details the property to be valued: "The *value* of the gross estate shall include the *value* of all property . . . to the extent of the amount receivable by the executor . . . [or, in certain cases] by all other beneficiaries." The history of the statute further supports the position that its purpose was to delineate the includ-

ability, and not the valuation, of insurance policies. Professors Kirby and Pedrick describe the relevant history of the provision as follows:

> The estate tax as originally enacted in 1916 contained no specific provision for the inclusion of life insurance in the gross estate; due to the peculiarities of life insurance, this failure to deal specifically with this type of asset left substantial uncertainties as to the includibility of the proceeds of life insurance which were not payable to the estate of the decedent. Accordingly, the 1918 Act attacked the problem with a specific provision.

W. Pedrick & V. Kirby, The Study of Federal Tax Law: Estate and Gift Tax 103 (1975). That provision, the antecedent of Section 2042, divided insurance into two categories: those receivable by executors and those receivable by beneficiaries where the decedent "had taken out such insurance on his own life." *Id.* Difficulties with determining whether the decedent had "taken out" insurance led to the amendment of the statute in 1942 to include in the estate proceeds payable to beneficiaries where the decedent either paid the premiums of the policy or retained incidents of ownership. *Id.* at 104. Finally, in 1954, Congress eliminated the "payment of premiums" test,[6] adopting the provision cur-

---

3. See I.R.C. §§ 6401–07.

4. It is not clear what the basis of such a refund claim would be. If, accepting *arguendo* the government's claim, the value of the policy is the amount receivable, the ultimate amount actually received, whether more or less than the face value, would be irrelevant to the valuation of the policy. This would be because the face value was "receivable" even if not in fact "received." In this respect the government's own position seems to be internally inconsistent, since the government only taxed the $1,000,000 received and not the $1,150,000 receivable. However, even if this regulation is construed to tax proceeds ultimately received and permit refund of overpayments, the taxpayer still may be denied relief because of the statute of limitations on refund claims. Section 6511 disallows refunds sought more than three years after the filing of the return or 2 years after the payment of the tax. This would have foreclosed a refund in this case if the tax had been paid and the insurance suit had been

lost by the estate, since the tax would have been paid in April 1970 and the litigation on the claims was not resolved until May 1972. Indeed, we do not doubt that litigation on contested claims in excess of two or three years would occur frequently.

5. Although the IRS has the discretion to defer payment of taxes, it may allow no more than a six-month extension, certainly less than the time usually required to settle or litigate a contested insurance claim. I.R.C. § 6161(a)(1).

6. The Senate Committee explained that the rationale for this elimination of the "payment of premiums" test was to "place life-insurance policies in an analogous position to other property . . . . . [N]o other property is subject to estate tax where the decedent initially purchased it and then long before his death gave away all rights to the property." S.Rep.No. 1622, 83rd Cong., 2d Sess. 124 (1954), U.S.Code Cong. & Admin.News 1954, pp. 4017, 4757. Thus, this alteration further reflects that Con-

rently in force. *Id.* Obviously, the unifying thread of these amendments is the Congressional attempt to clarify just which policies on the life of the decedent are subject to the estate tax. The valuation of those policies, and the extent of the tax, presumably remain within the control of other sections of the Code.

This construction is also in accord with the reasoning underlying the Second Circuit decision in *Estate of Skifter v. Commissioner,* 468 F.2d 699, 704–05 (2d Cir. 1972). Although addressing questions not presented in this case, the court emphasized that Congress did not intend section 2042 to "operate in such a manner as to discriminate against life insurance, with regard to estate tax treatment as compared with other types of property." *Id.* at 704. The court therefore construed section 2042 in accordance with principles underlying other sections of the Code. Similarly, we believe that the value of insurance claims should be measured by reference to the general rules of valuation applied to other forms of property includible in the gross estate. That measure is of course fair market value on the date of death.

The government in its attempt to tax the ultimately recovered proceeds places its strongest emphasis on the regulations promulgated under section 2042. As we noted earlier, those regulations provide that "the amount to be included in the gross estate under section 2042 is the full amount receivable under the policy." Treas.Reg. § 20.2042–1(a)(3). The government urges that this regulation should be construed as providing that the taxable value of an insurance claim, even one on which payment has been refused, is the face value of the policy.

We believe, however, that this regulation, like the statute under which it was promulgated, deals only with includibility and not with valuation of insurance policies. As a prefatory matter, we note that in determining the includibility of assets in an estate, a necessary subsidiary question as to any asset is the percentage of that asset which is properly included in the estate. Some portion of the value of many assets simply cannot be attributed to the decedent,[7] and therefore cannot properly be taxed. It is this question of includible percentage—or proper *apportionment* of value—which this regulation addresses, as a full examination of its context reveals.

The regulation, with its preface, reads: "Except as provided in paragraph (c)(6), the amount to be included . . . is the full amount receivable under the policy." The exception establishes the proper apportionment to the estate for insurance on the decedent owned by, and payable to, a corporation controlled by the decedent. In those instances the gross estate does not include the insurance. However, where proceeds are payable to both the corporation and a third party, then the includible amounts must be apportioned:

> [I]f the decedent is the controlling stockholder in a corporation, and the corporation owns a life insurance policy on his life, the proceeds of which are payable to the decedent's spouse, the incidents of ownership held by the corporation will be attributed to the decedent through his stock ownership and the proceeds will be included in his gross estate under section 2042. If in this example the policy proceeds have been payable 40 percent to decedent's spouse and 60 percent to the corporation, *only 40 percent of the proceeds would be included in decedent's gross estate under section 2042.*

Treas.Reg. § 20.2042–1(c)(6) (emphasis added). The example cited by this regulation, in apportioning the amounts of insurance proceeds included in the estate, make clear that the underlying concern of subsection

gress's central intent in section 2042 was to define the measure of includability.

**7.** This subsidiary question surfaces throughout the regulations. *See, e. g.,* Treas.Reg. § 20.0–2(b)(2): "The value of the gross estate includes the value of property *to the extent of the inter-*

*est therein of the decedent."* (Emphasis supplied.) Section 2042 of the Code also seems to recognize this issue where it provides that value includes "the value of all property . . . *to the extent* of the amount receivable."

(a)(3) is the definition of includible percentages, in most instances 100 percent, or the "full amount."

This construction of the regulation is certainly buttressed—and probably required—by the general regulation of valuation. The regulations promulgated under section 2031 of the Code, the section dealing with valuation provide:

> the value of the gross estate . . . is the total value of the interests described in sections 2033 through 2044. . . . In arriving at the value of the gross estate *the interests described in sections 2033 through 2044* are valued as described in this section . . .

Treas.Reg. § 20.2031–1(a). That section defines value in the following terms:

> The value of *every item of property includible in a . . . gross estate under sections 2031 through 2044* is its fair market value at the time of . . . death. . . .

Neither regulation mentions any special rule of valuation for insurance losses includible under section 2042; on the contrary, the regulations state that items under section 2042, like all other assets, are valued according to their fair market value at the time of death. The regulations specifically mandate that, "[a]ll relevant facts and elements of value as of the applicable valuation date *shall be considered in every case.*" Treas.Reg. § 20.2031–1(b) (emphasis added). The government's argument that this command is inapplicable to claims for insurance proceeds is simply unpersuasive.

Two other reasons are dispositive in our construction of this provision. First, we note that there are no recorded decisions of the IRS or any court applying this regulation in such a manner.[8] Second, as we have pointed out, such a construction would also yield an unduly harsh result in non-recovery situations.

We note finally that even if we were to accept the government's construction of this regulation, we would hesitate to apply it in the context of this case. This case, after all, ultimately involves the invocation of a penalty provision. Given the stricter and more rigorous standards involved in a penalty case,[9] any questions which we may have had as to our prior construction of this regulation in the plaintiff's favor, completely disappear. Accordingly we hold that the penalty to be assessed in this case must be based on the value of the claims at the date of death and not on the amount of the claims ultimately recovered. We, therefore, reverse the district court and remand for a determination of the value of these claims at death.

**REVERSED AND REMANDED.**

---

8. The cases and authorities cited by the government all deal with insurance claims which were not contested by the insurer. *See, e. g., Schongalla v. Hickey,* 60 F.Supp. 814, 818 (N.D.N.Y. 1943), *aff'd,* 149 F.2d 687 (2d Cir.), *cert. denied,* 326 U.S. 736, 66 S.Ct. 46, 90 L.Ed. 439 (1945) (Payment of face value in installments); *Estate of Wright v. Commissioner,* 8 T.C. 531 (1947); 2 Mertens, Law of Federal Gift and Estate Taxation § 17.19; C. Lowndes, R. Cramer & McCord, Federal Estate and Gift Taxes § 18.35 (3d ed.) This court has been unable to find any reported opinion of the IRS or any court applying Treas.Reg. § 20.2042–1(a)(3) in the context of a contested insurance claim.

9. *See Commissioner v. Acker,* 361 U.S. 87, 91, 80 S.Ct. 144, 147, 4 L.Ed.2d 127 (1959):

> We are here concerned with a taxing Act which imposes a penalty. The law is settled that "penal statutes are to be construed strictly," . . . and that one "is not to be subjected to a penalty unless the words of the statute plainly impose it . . . ."

The government has argued additionally that the plaintiff's concession that the tax was properly based on the ultimately received amounts is inconsistent with its position that the penalty should be based on the date of death value. However, given the different principles of construction applicable to penalty and taxing provisions, no such inconsistency arises.