ESTATE OF EDITH V. HENDERSON, DECEASED, KATHLEEN FENSKE, AND DIANE McMAHON, CO-ADMINISTRATRICES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Henderson v. Commissioner
Docket No. 14245-84
United States Tax Court
T.C. Memo 1989-79; 1989 Tax Ct. Memo LEXIS 83; 56 T.C.M. (CCH) 1332; T.C.M. (RIA) 89079; February 27, 1989. Marshall W. Taylor, *85 for the petitioner. Patrick E. McGinnis, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined an estate tax deficiency of $ 303,300 and an addition to tax for failure to timely file an estate tax return, pursuant to section 6651(a)(1), [1] in the amount of $ 60,660. This case involves a life insurance policy allegedly purchasd by decedent on her life. The issues to be decided are: (i) to what extent is decedent's contested life insurance policy includable in her gross estate under section 2042; (ii) what is the fair market value of decedent's contested life insurance policy as a contingent claim in her gross estate, as determined by section 2031; (iii) whether decedent's gross estate should include a community property interest in her husband's tort claim against the insurer for misrepresentation; (iv) whether the estate is entitled to a marital deduction of one-half or the value of said policy because decedent's surviving husband was listed as the primary beneficiary thereunder; (v) whether one-half of all proceeds recovered as to the insurance policy should be excluded from the gross estate because they *86 are property of decedent's husband under California community property laws; (vi) whether petitioner is entitled to a deduction for additional attorney's fees, and allowable deductions and credits for interest and state death taxes (if we find that there is a deficiency in the estate tax); and (vii) whether petitioner is liable for an addition to tax pursuant to section 6651(a)(1) for failure to timely file an estate tax return. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and numerous exhibits attached thereto are incorporated herein by this reference. Edith V. Henderson ("decedent") died testate on February 28, 1980, at the age of 56. Decedent was a resident of Orange County, California at the time of her death. Kathleen Fenske and Diane McMahon, co-administratrices of decedent's estate, both resided in Laguna Niguel, California at the time the petition herein was filed. Decedent was survived *87 by her husband, John D. Henderson (hereinafter referred to as "Henderson") and by her four adult children from a previous marriage, Diane McMahon and Kathleen D. Fenske, Gordon McMahon, Jr. and Kindra McMahon (collectively referred to as "decedent's children"). Diane McMahon and Kathleen Fenske were appointed co-administratrices of decedent's estate, by the appropriate California court in which decedent's will was probated. In June of 1979, decedent and her daughter, Diane, were approached by James Angelos, a businessman who leased space from decedent, concerning the possibility of obtaining a free life insurance policy in the amount of one million dollars. Angelos told them that his friend Tom Van Houten was writing these free policies and that Van Houten would take decedent and Diane to lunch in order to explain the details of such a deal. Decedent and Diane subsequently attended lunch with Angelos and Van Houten. Van Houten was a life insurance agent with Impaired Risk, Inc. ("Impaired Risk"), an insurance agency which had entered into a Managing General Agent's Agreement to sell the life insurance products of the Life Insurance Company of California ("Life of Cal"). (Life *88 of Cal was later acquired by E. F. Hutton & Co.) This agreement permitted Impaired Risk to solicit the purchases of life insurance policies sold through Life of Cal. Impaired Risk's Managing General Agent's Agreement permitted it to obtain the appointment of other agents to sell Life of Cal policies. On October 30, 1977, Impaired Risk appointed Thomas Van Houten as an agent for Life of Cal. Van Houten sold a certain type of policy called 30-Pay policies to the exclusion of all other types of Life of Cal life insurance policies. Van Houten explained that he was able to write one-million dollar life insurance policies without charging the first year's premium by borrowing against the impending cash value of the policy and by applying part of the agent's commission to the cost of the premium. Decedent was not initially disposed to secure such a "free" insurance policy, but later set up another meeting with Van Houten in order to fill out an application. Decedent decided to pursue the free policy at the urging of her husband Henderson, who convinced her that retention of such a policy would enhanced their creditworthiness. Van Houten took the application and informed decedent *89 that a credit firm would contact her concerning personal financial information. He also arranged for decedent to take medical examinations on June 17 and June 26, 1979. Decedent obtained a one-million dollar 30-Pay whole life insurance policy from Life of Cal. Impaired Risk sold 30-Pay on an almost exclusive basis, primarily because the commission payable in the first year to an agent who sold this policy was 103 percent of the premium. The commissions were substantially less in rewal years. The 30-Pay policy was a whole life policy in which the cash value of the policy could be borrowed by the insured. The 30-Pay policy had a "Minimum Deposit Policy Loan Agreement" feature, which allowed the insured to immediately take advantages of the cash value that would accrue in the first year by applying it against the first year premium. This loan against the policy's cash value reduced the out-of-pocket expenditures for the first year's premium by approximately 25 percent. The combined effect of the cash value, the loan and the 103-percent commission to the agent in the first year created a circumstance in which unscrupulous selling agents could offer "free" one-year life insurance *90 policies by using their commission to pay the first year premium, in excess of the policy loan, and still retain approximately 25 percent of their first year's commission. In spite of the fact that this type of activity, known as premium rebating, was illegal in California (see infra, p. 16), Impaired Risk actively promoted deals of this nature, with the help of certain high-ranking officers of Life of Cal. In this scheme, the actual payment of premiums was made through a check kite in which a check for the premium, which would have been issued either by the insured or a third party, was delivered to Life of Cal, at which time Life of Cal would simultaneously issue a commission check to the insured or a third party. The insured or third party would then apply the Life of Cal checks, as well as the borrowed cash value of the policy, towards the check which had just been given to Life of Cal. From 1977 to 1980, Van Houten "sold" approximately 100 30-Pay policies, which constituted approximately 40 percent of Life of Cal's national business during certain periods. The policy application which Van Houten took for decedent listed Henderson as the primary beneficiary and the four *91 children as contingent beneficiaries. (Diane McMahon, however, later maintained that this designation was not in accordance with decedent's instructions and that decedent had instructed Van Houten to list the four children and Henderson equally as primary beneficiaries.) A minimum deposit loan on decedent's policy in the amount of $ 10,373 was made by Life of Cal, the proceeds of which were applied by decedent to her first year premium on the one-million dollar policy, reducing the $ 40,750 premium to $ 30,377. A check for this amount was drawn by Angelos from an Impaired Risk checking account. After being advised that the checks drawn on the Impaired Risk checking account had been returned for insufficient funds, Angelos paid the premium personally with a cashier's check and was subsequently reimbursed by Impaired Risk. Decedent never paid anything for her one-million dollar life insurance policy. The selling agents received a profit of $ 11,595.50 on this illegal transaction. In the same fashion, Henderson received an identical life insurance policy on his life from Van Houten. In subsequent litigation concerning the validity of decedent's life insurance policy, there was *92 a dispute as to whether decedent had promised to reimburse Impaired Risk for the $ 11,595.50 commission Van Houten rebated to decedent for the first year's premium. Henderson prepared, executed and signed a promissory note to Impaired Risk for decedent's rebated premium on her behalf. Henderson prepared this note after decedent's death in order to give the appearance that decedent actually intended to repay the related commission to Van Houten. Van Houten never accepted promissory notes from any of his "customers." Neither Impaired Risk nor Life of Cal ever made any demand or took any action against decedent, her estate or Henderson with respect to the promissory notes. Decedent's application for insurance required financial disclosure as to her estimated net work as well as her monthly income. Decedent's life insurance policy declarations stated that she had an estimated worth of "1,000,000 plus" and a yearly income of $ 75,000. Decedent told a credit representative that she would receive a salary of $ 48,000 per year from her company and a bonus of $ 60,000 in 1979, for a combined earned income of $ 108,000. Decedent also represented to Equifax that she had an $ 825,000 interest *93 in IntraPacific Investments and real estate worth one million dollars. Most of the real property owned by decedent was heavily mortgaged and her interest in IntraPacific was virtually worthless. Henderson's responses to the financial information requested on the application for his one million dollar life insurance policy were that his net worth was one million dollars and that his yearly income as a salaried employee was $ 100,000 plus. The Henderson's joint income tax return for 1978, however, reveals that their reported total gross income was $ 580.00 in taxable year 1978. Decedent and Henderson paid for most of their living expenses by borrowing money on the strength of real property that decedent owned. Life of Cal first became apprised that something was amiss concerning the actions of Impaired Risk's agents when it received a letter from an official of Impaired Risk, which stated that very few of their customers were "renewing" their policies and suggested that the reason for this low rate of renewal was that the second year commission paid by Life of Cal were so low that Impaired Risk agents did not have sufficient incentive to persuade the customers to renew. This letter *94 prompted Life of Cal to undertake an investigation of business written by Impaired Risk. A preliminary investigation showed an alarmingly high first year lapse ratio for policies written by Impaired Risk. Life of Cal attempted to contact the actual policyholders in an attempt to discover why the 30-Pay customers of Impaired Risk failed to renew their contracts. In March 1980, Impaired Risk filed suit in San Jose to enjoin Life of Cal from contacting Impaired Risk clients. Life of Cal [2] terminated its agency relationship with Impaired Risk on April 8, 1980. Of the 161 30-Pay policies written by Impaired Risk, all but four had lapsed by October 18, 1983. Edith Henderson died on February 28, 1980. On April 3, 1980, John Henderson filed a claim for benefits under the insurance policy that decedent had taken out. On April 4, 1980, Kathleen Fenske and Diane McMahon made a claim by *95 telegram under the same policy. Kathleen and Diane sent a letter confirming their claim on April 7, 1980, and filed a claim for benefits on June 23, 1980. On August 12, 1980, Hutton Life, the successor company to Life of Cal, filed a Complaint for Declaratory Relief with the San Diego County Superior Court, naming Henderson and the four children of decedent as defendants. Hutton Life asked for a judicial determination of the rights and duties of the parties under the policy. Hutton Life employed a declaratory judgment action rather than an interpleader action in order to preserve its ability to raise substantive defenses concerning the underlying validity of the policy, as well as to determine which of the beneficiaries, if any, were entitled to recover on the policy. On August 29, 1980, Henderson, through his attorney, answered Hutton Life's complaint and simultaneously filed a cross-complaint against his co-defendants, decedent's four children. His answer generally denied the allegations of Hutton Life's complaint and sought declaratory relief in his favor. The cross-complaint alleged that decedent's children had wrongfully fabricated a claim against decedent's policy in order *96 to interfere with Henderson's rights to the proceeds. The cross-complaint sought general damages for emotional distress, other claimed proximate damages, as well as ten million dollars in punitive damages. On December 12, 1980, the four children, through their attorney James Campbell, filed answers to Hutton Life's complaint and Henderson's cross-complaint denying the factual allegations of the complaint and cross-complaint and sought judgment for the children in both actions. In January 1981, the children discharged James Campbell and retained the law firm of Shernoff, Wild, Lipsky and Blickenstaff (hereinafter "the Shernoff firm"). William Shernoff, the senior and founding partner of the firm, was a successful and nationally renowned litigator specializing in plaintiff cases involving the bad faith refusal of insurance companies to pay claims. Shernoff's firm succeeded in getting Henderson and decedent's children to settle their differences by filing a stipulation with the court on March 3, 1981, in which the co-defendants declared that there was no remaining controversy among them and which directed Hutton Life to pay 53 percent of any proceeds to Henderson and 47 percent *97 to any proceeds to the four children. Hutton Life responded by filing its first amended complaint on April 30, 1981, in which it alleged that decedent and Henderson had procured decedent's insurance policy by means of an unlawful premium rebate scheme, which, Hutton Life alleged, rendered the policy void under California law and freed Hutton Life from any obligation to pay anything to the policy claimants. Hutton also asserted that it was not liable to Henderson because decedent conceded and falsely represented relevant aspects of her financial history. On June 9, 1981, decedent's children, through the Shernoff firm, filed a cross-complaint against Hutton Life for tortious breach of insurance contract. Settlement negotiations commenced shortly after this cross-complaint was filed and $ 496,998.68 was paid to the children and their lawyers on July 16, 1981, after a full release was signed. The release signed by the four children contemplated their relinquishment of all contract and tort claims against Hutton Life, and also included the express agreement of Shernoff that he would not represent any of the other parties or related persons in this action involving Hutton Life. No *98 settlement was offered by Hutton Life to Henderson at this time. The litigation between Hutton Life and Henderson concerning Henderson's suit for breach of contract on the policy and related tort claims was heard in California Superior Court before a jury in October 1983, the Honorable Judge G. Dennis Adams presiding. At the close of evidence, Judge Adams ruled from the bench on October 25, 1983, that decedent's policy was unenforceable and void ab initio because it had been obtained pursuant to an unlawful premium rebate scheme and that Henderson could not recover upon his contractual claims to the policy proceeds. The judge allowed Henderson's tort claims to go to the jury. The court, on findings by the jury, determined that Hutton Life had engaged in a fraudulent misrepresentation upon Henderson by purporting to issue a policy when in fact none had been issued. On the tort issues, the jury awarded Henderson compensatory damages in the amount of $ 350,000 for mental distress and punitive damages in the amount of ten million dollars. The jury's findings became subject to an order for remittitur in February of 1984, which was followed by cross-appeals and further preparation *99 for a retrial. In March of 1986, the parties finally settled the matter when Hutton Life agreed to pay Henderson $ 1,450,000 as compensation for his personal injuries, anxieties, fears and emotional distress. No amount was designated for punitive damages. In his statutory notice of deficiency, respondent determined that the full face amount of decedent's 30-Pay policy, $ 1,000,000, should be included in decedent's gross estate pursuant to section 2042. Approximately two weeks before trial, respondent filed a motion to amend his answer, in which he claimed for the first time that one-half of the amount received by Henderson in settlement of his tort claim should be included in decedent's gross estate because the claim was the community property of decedent. Petitioner contends that no insurance was receivable by the estate because decedent's policy was void ab initio, rendering it valueless at decedent's death; alternatively, petitioner claims that the value of decedent's insurance policy should be subject to substantial discounts if it is determined that it should be included in decedent's gross estate. Petitioner also contends that decedent had no interest in the tort recoveries *100 won by Henderson which should not be included as contingent claims in decedent's gross estate. Finally, petitioner contends that decedent's estate is not liable for an addition to tax for failure to timely file an estate tax return since no estate tax return was required to be filed. A "protective return" was filed for the estate which, although not timely, disclosed no gross estate, and was not filed by an authorized representative of decedent's estate. OPINION Section 2033 provides that the gross estate of a decedent shall include the value of all property to the extent of his interest therein at the time of death. Section 20.2033-1(a), Estate Tax Regs., further states that, "The gross estate of a decedent * * * at the time of his death includes under section 2033 the value of all property, whether real or personal, tangible or intangible, and wherever situated, beneficially owned by decedent at the time of his death." In particular, section 2042 requires that the gross estate include the amount of insurance received by the executor under policies on decedent's life, or by other beneficiaries if decedent possessed any incidents of ownership over the policy at the time of *101 his death. A decedent is considered to have an "incident of ownership" in an insurance policy on his life if he or she retains the power to change the beneficiary on the policy, surrender or cancel the policy, assign the policy, revoke an assignment or pledge the policy for a loan against the surrender value of the policy. Sec. 20.2042-1(c)(2), Estate Tax Regs. Respondent and petitioner agree that decedent retained incidents of ownership over her 30-Pay policy (assuming that the policy was valid), in that, as the owner of the policy, decedent was capable of assigning the policy or changing the beneficiary designation. Section 20.2042-1(a)(3), Estate Tax Reg., provides that the "full amount receivable under the policy" is included in the gross estate of the owner. The value of items comprising the gross estate is determined in accordance with section 2031(a), which provides: "The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." The regulations under section 2031 expand upon this, providing that: *102 the value of the gross estate of a decedent * * * at the time of his death is the total value of the interests described in section 2033 through 2044. * * * In arriving at the value of the gross estate the interests described in section 2033 through 2044 are valued as described in this section, §§ 20.2031-2 through 20.2031-9 and § 20.2032-1. Sec. 20.2031-1(a), Estate Tax Regs. Section 20.2031-1(b), Estate Tax Regs., defines fair market value for purpose of determining the value of items in the gross estate: Valuation of property in general. The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death * * *. The fair market is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. * * * The date of a decedent's death is the relevant time for determining not only what interests must be included in the gross estate, but also the value of such times. Sec. 20.2033-1(a), Estate Tax Regs.; sec. 20.2031-1(b), Estate *103 Tax Regs. We must first determine what assets should be included in decedent's gross estate; then, the fair market value of such inclusions in her gross estate, if any, must be determined. Petitioner bears the burden of proof to show that respondent erred in determining that the Life of Cal policy had value and was includable in decedent's gross estate. Rule 142(a). (a) Includability of Decedent's Insurance Policy in Her Gross Estate
Decedent's insurance policy was procured by means of an illegal premium rebate scheme by which decedent, in concert with an insurance agent, obtained a "free" one million dollar insurance policy. After reviewing all the relevant facts concerning this insurance contract, the Superior Court of the State of California for San Diego County, granted declaratory relief of Hutton Life on October 25, 1983, by holding that the insurance policy issued to decedent was unenforceable and void ab initio. Decedent's insurance policy was obtained in violation of Cal. Ins. Code sections 750 and 750.1 of the California Insurance Code (West 1972), which provide as follows: § 750. Rebate of Premium In insurer, insurance agent, broker, *104 or solicitor, personally, or by any other party, shall not offer or pay, directly or indirectly, as an inducement to insurance or any subject matter in this State, any rebate of the whole or part of the premium on an insurance contract, an of the agent's or broker's commission thereon, and such rebate is an unlawful rebate. § 750.1 Unlawful rebates, profits and commissions; legislative finding, declarations and intent The Legislature hereby finds and declares that the continued regulation of the business practices of insurers and their producers is in the interest of the citizens of the state and that the control and limitations of unlawful rebates, profits, and commissions is an essential component of that regulation which is necessary to effectuate an adequate and complete system and regulation of insurer and producer business practices. The Legislature finds that the statutes controlling unlawful rebates, profits, and commissions continue to provide critical protection to insureds in this state from the numerous consequences that would occur in the absence of such regulation, including company insolvencies, unfair discrimination between insureds with identical risks creating *105 subsidies from small purchasers of insurance in favor of large purchasers of insurance, decreased quality of services to insurance consumers, increased concentration of insurance distribution and sales mechanisms, and misrepresentation and unethical sales practices such as improper replacement or twisting to the detriment of the public. It is the intent of the Legislature in enacting this section to clearly set forth the legislative intent supporting the enactment, continuing vitality, and importance of the unlawful rebates, profits, and commissions sections of this code. Respondent contends that he is not bound by the ruling of a lower state court in a proceeding to which he was not a party. We agree with respondent that Federal courts, in the absence of a decision by a state's highest court, must apply the appropriate state law after giving due regard to the rulings of other courts in that state. Commissioner v. Estate of Bosch,387 U.S. 456 (1967); Estate of Rowan v. Commissioner,54 T.C. 633 (1970). We also concur with respondent that the Tax Court, in the present situation, is required to make its own independent findings concerning state *106 law. Ahmanson Foundation v. United States,674 F.2d 761 (9th Cir. 1981). The California Supreme Court has never addressed the issue of whether an insurance policy issued in violation of the antirebate statute is null and void. Indeed, there are very few cases involving antirebate statutes to be found in the entire United States. See Contractor's Safety Assn. v. California Compensation Ins. Co.,48 Cal.2d 71, 307 P.2d 626 (1957); Hyde Insurance Agency, Inc. v. Dixie Leasing Corp.,28 N.C. App. 138, 215 S.E.2d 162 (1975); Key System Transit Lines v. Pacific Employers Insurance Co.,52 Cal.2d 800, 345 P.2d 257 (1959). However, we rely on Homestead Supplies, Inc. v. Executive Life Ins. Co.,81 Cal. App. 3d 978, 147 Cal. Rptr. 22 (1978) ("Homestead Supplies"), in determining state law concerning the enforceability of insurance policies issued in violation of California's antirebate statute. In Homestead Supplies, an insured obtained a misquoted rate for his life insurance policy. When it was discovered that the quoted rate was lower than it should have been, the insurer's president wrote *107 to the insured, explaining the mistake, yet agreeing to honor the incorrect quotation. Six years later the insurer informed the insured that it would require all future payments to be made in the amount of the larger, correct premium figure. The insured sued the insurer, seeking a declaration that the appropriate premium was the lower figure. The insurer argued that its earlier agreement to accept the lower premium was unenforceable because it constituted an unlawful rebate, as well as illegal rate discrimination. The lower court found for the insurer. The state appeals court reversed, holding that while enforcement of the insurer's promise to charge a lower rate might constitute a technical violation of the antidiscrimination and antirebate statutes, the degree of illegality was insufficient to render the agreement unenforceable under the circumstances. The appeals court found that the original quotation of the low premium by the insurer's agent was an apparent good faith mistake and that the insurer's decision to stand behind the agent's quote was done in good faith, not with the intention of violating the antirebate provisions. Homestead Supplies, 81 Cal. App. at 986. *108 The court determined that the enforceability of a contract made in violation of a law was dependent on the facts and circumstances of the particular case with particular weight placed on the kind and degree of illegality involved, the public policy or policies to be served, whether those public policies will best be served by enforcing the agreement or denying enforcement and the relative culpability and equities of the parties. Homestead Supplies, 81 Cal. App. at 989. The court cited Justice Traynor of the California Supreme Court in Lewis & Queen v. N. M. Ball Sons,48 Cal.2d 141, 150-151, 308 P.2d 713, 719 (1957), explaining the commonly accepted approach in California concerning the enforceability of illegal contracts: The courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act. The reason for this refusal is not that the courts are unaware of possible injustice between the parties, and that the defendant may be left in possession of some benefit he should in good conscience turn over to the plaintiff, but that this consideration is outweighed by the importance of *109 deterring illegal conduct. * * * In some cases, on the other hand, * * * effective deterrence is best realized by enforcing the plaintiff's claim rather than leaving the defendant in possession of the benefit; or the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. In each such case, how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved. Homestead Supplies,81 Cal. App. 3d at 990. Finally, the court in Homestead Supplies, citing 1 Witkin, Summary of Cal. Law, Contracts § 362, (8th ed. 1973), listed several specific factors that had been frequently considered by courts as to whether an illegal contract should be enforced, including: (1) whether the violation of law involved serious moral turpitude; (2) whether the parties are in pari delicto; (3) whether the adverse party would be unjustly enriched if enforcement were denied; (4) whether the forfeiture resulting from denial of enforcement would be disproportionately harsh in proportion to the illegality. Citing Robertson v. Hyde,58 Cal. App.2d 667, 137 P.2d 703 (1943), *110 the court also stated that it would consider whether the purpose of the statute that was violated will best be served by enforcement or denial of enforcement. Homestead Supplies, 81 Cal. App. at 990-991. We will now examine the above factors to determine whether decedent's insurance policy would have been enforced under California law. It is clear that the entire illegal premium rebate scheme carried on by Impaired Risk was in gross violation of the antirebate statutes of the California Insurance Code. In addition, this scheme resulted in substantial losses to Hutton Life and, in turn, has resulted or will result in increased costs to insured people in California. A large measure of the damage has been borne by the insurance industry as a whole, which has been dragged into the mire by the actions of a few unscrupulous life insurance agents. The agents involved in this scheme were motivated solely by greed, with a conscious disregard for both the insurance needs of their customers and the economic viability of the insurance companies they wrote policies for. Given the scope of the antirebate scheme and its effect on the insurance industry and insured people in *111 California, we conclude that this violation of the antirebate laws was so objectionable that it involved moral turpitude. The court in Homestead Supplies found that the insured and insurer were not in pari delicto. Even though the insurer knew or should have known of the potential illegality of accepting a renewal premium lower than allowed by the rate table, the insured had no reason to know that the quoted premium was potentially illegal. In the instant case, however, Van Houten was quite aware that he was violating the antirebate statutes. Decedent knowingly accepted an unlawful rebate in violation of Cal. Ins. Code sec. 752 (West 1972), [3] in that she "purchased" an insurance policy by applying a rebate of $ 30,377 from the agent's commission towards payment of the first year's premium ($ 40,750). "Knowingly" is not defined in the Insurance Code; however, it seems likely that the definition in the Penal Code would apply to criminal statutes contained in the Insurance Code. Section 7(5) of the Penal Code defines "knowingly" as "import[ing] only a knowledge that the facts exist which bring the act or omission within the provisions of this code. *112 It does not require any knowledge of the unlawfulness of such act or omission." Cal. Penal Code § 7(5) (West 1976); Hallett, "Life Insurance Agent Fraud in California: Rebating and Related Misconduct," 17 Loyola L. Rev. 809, 821 (1984). Additionally, decedent's misrepresentations on her insurance application strongly suggest that she knew that her policy was illegally obtained. [4] Decedent represented in her application for the life insurance that she had a net worth in excess of one million dollars and a yearly income of $ 75,000 in 1978, even though the joint Federal income tax return for both decedent and Henderson reflect total gross income of only $ 580.00 in 1978. Diane McMahon testified that Henderson had not worked in several years and that decedent had heavily mortgaged her real property in order to pay basic living expenses. Henderson convinced decedent to apply for a policy which she knew was illegally obtained in order to facilitate their borrowing. Neither decedent nor Henderson cared whether or not she had a valid insurance policy. We conclude that decedent and Van Houten were in pari delicto with regard to decedent's illegally *113 obtained insurance policy. Hutton Life would not have been unjustly enriched if decedent's policy had not been enforced, since it never received any premiums, except from its own money. Likewise, a decision not to enforce the insurance policy would not result in a forfeiture to decedent or to her beneficiaries, because no premium was ever paid for the policy and decedent knew that the policy was a sham. If anything, enforcement of decedent's life insurance policy would be a disproportionately harsh result, given the illegality of the contract and the damage to the insurer. The last factor to consider is whether *114 the purpose of California's antirebate statute is best served by enforcement or nonenforcement of decedent's insurance policy. As the court in Homestead Supplies noted, violation of the antirebate statute is a misdemeanor and constitutes grounds for disciplinary action for an agent. Cal. Ins. Code sec. 766 (West 1972). Homestead Supplies,81 Cal. App. 3d at 991-992. A knowing violation of the antirebate laws is also grounds for suspension of an insurer's certificate of authority. Cal. Ins. Code Sec. 765 (West 1972). In addition, we have directly held that decedent knowingly accepted an unlawful rebate and thus was guilty of a misdemeanor, pursuant to Cal. Ins. Code sec. 752 (West 1972). The California Legislature has clearly taken a strong stance against the practice of rebating, as evidenced by the statutory sanctions imposed on offenders. There are good policy reasons behind such strong penalties, namely, the protection of the public and the preservation of the financial integrity of the insurance industry. The purpose of the antirebate statutes is best served in this case by denial of enforcement *115 of decedent's insurance policy. For the above reasons, we hold that decedent's life insurance policy was void ab initio under California law and that no insurance proceeds were receivable under such policy or should be included in decedent's gross estate under section 2042. (b) Value of Decedent's Insurance Claim Against Hutton Life Even were we to assume that decedent's insurance policy was not void under California law, and should thus have been included in decedent's gross estate under section 2042, we would find that the fair market value of her life insurance policy, as determined under section 20.2031-1(b), was zero. One of the few cases dealing with the valuation of proceeds received on a contested life insurance policy is American National Bank & Trust Co. v. United States,594 F.2d 1141 (7th Cir. 1979) ("American National Bank"). The issue in this case was whether the addition to tax for an untimely filed estate tax return should have been based on the value of the contested insurance claim at death or the actual proceeds that were ultimately recovered. The Court of Appeals for the Seventh Circuit held that the value of the insurance claim *116 at the date of death was the appropriate value upon which to assess the addition for late-filing. The facts of American National Bank are as follows: An insured was killed when the automobile that he was driving was struck by a train. According to an eyewitness at the scene of the accident, the insured had driven onto the train tracks while the warning bells were ringing. In doing so, he passed a car that was awaiting the approaching train. The witness then watched the insured repeatedly back off and on the railroad tracks, until he was struck and killed by the oncoming train. In addition to this evidence which strongly suggested that insured had committed suicide, it was discovered that the insured had embezzled a substantial amount of money from a corporation and that he was unable to meet corporate demands to repay the embezzled funds. Further, insured applied for and obtained binders for $ 450,000 of accidental death insurance within one month of his death. Two months before his death, decedent also obtained a binder for $ 500,000 of accidental death insurance. When these amounts were combined with life insurance he obtained in the year prior to his death, insured *117 had insurance coverage of $ 200,000 in life insurance and $ 1,150,000 in accidental death insurance. The insurers refused payment on the basis of suicide clauses. The executor brought suit, but not before the date on which the estate tax return was required to have been filed. No return was filed until almost two years from the time the return was originally required to be filed. Two years after the return was filed, the accidental death insurance claims were tried, and a verdict was obtained on behalf of the estate for $ 1,000,000. The Internal Revenue Service ("IRS") included the entire one million dollars in the insured's gross estate, and assessed the tax due and the underlying delinquency addition on that amount. The executor claimed that the addition should have been computed on the basis of the value of the claims at the date of death, which he claimed was minimal or nonexistent. In determining the value of the insured's claims under the insurance policies, the court observed that the value of the gross estate is defined by section 2031(a) as "the value at the time of * * * [the decedent's] death of all property, real or personal, tangible or intangible, wherever *118 situated." American National Bank,594 F.2d at 1144. The IRS argued that, notwithstanding the contingency of the receipt of proceeds, the estate should have reported and paid tax on the amounts receivable under the policies, because section 20.2042-1(a)(3), Estate Tax Regs., provides that "the amount to be included in the gross estate under section 2042 is the full amount receivable under the policy" (emphasis added), which, if accepted, would have required insured's estate to have listed the $ 1.15 million receivable on the policies as an asset in the gross estate at the time its return should have been filed. The court determined that section 2042 does not serve to value items, but merely to include them in the gross estate. It based this conclusion on an evaluation of the legislative intent behind section 2042 and its forerunners, noting that the statute and all amendments thereto are concerned with the question of when to include certain insurance proceeds in an estate and when to exclude same proceeds: Obviously, the unifying thread of these amendments is the Congressional attempt to clarify just which policies on the life of the decedent are subject *119 to the estate tax. The valuation of those policies, and the extent of the tax, presumably remain within the control of other sections of the Code. * * * we believe that the value of insurance claims should be measured by reference to the general rules of valuation applied to other forms of property includible in the gross estate. That measure is of course fair market value on the date of death. American National Bank,594 F.2d at 1147. Respondent agrees with the Court of Appeals for the Seventh Circuit that section 2042 speaks to includability and not to the valuation of the insurance benefits that are received. Respondent contends that the value of a policy is clearly ascertainable from its face and such amount is usually paid promptly by the insurer. An insurance policy is valued according to section 2031 only in the event that liability is genuinely contested by the insurance company. We agree with respondent that valuing insurance proceeds is a simple and straightforward task in the vast majority of situations, simply because the insurance company's liability is established before death and is clearly evidenced by means of a contract. Respondent *120 argues that there was no genuine contest between decedent and Hutton Life. Therefore, the face amount of insurance on the policy should be included in decedent's gross estate and valued at face amount. [5] Respondent claims that the litigation between Hutton Life, decedent's children and Henderson was necessary merely to establish who was to receive the policy proceeds, not to establish whether Hutton Life was liable at all. [6] We disagree. *121 Hutton Life filed a declaratory judgment action against decedent's children and Henderson, instead of an interpleader action, to preserve its ability to assert that it was liable to neither party under the insurance contract. Hutton Life used a declaratory judgment action because they were in the process of formulating defenses against decedent's children and Henderson. In an effort to "flush out" Hutton Life, decedent's children and Henderson filed a stipulation, settling any dispute between decedent's children and Henderson and fixing the amount payable to each. Hutton Life then promptly filed an amended complaint in which they contested the validity of the policy. In addition to Hutton Life's defense that the policy was an unenforceable policy issued in violation of the antirebate statutes, Hutton Life also contended that the policy was unenforceable because decedent concealed certain financial information from them and that she made false representations in her financial application. Hutton Life had substantial defenses against decedent's contractual claims. Section 330 of the California Insurance Code provides that "Neglect to communicate that which a party knows, and *122 ought to communicate, is concealment." Cal. Ins. Code sec. 330 (West 1972); Thompson v. Occidental Life Ins. Co. of California,9 Cal. App. 3d 904, 513 P.2d 353 (1973). Section 331 establishes that "Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance." Cal. Ins. Code sec. 331 (West 1972). Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co.,64 Cal. App. 3d 261, 134 Cal. Rptr. 427 (1976). Section 359 also provides: "If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false." Cal. Ins. Code sec. 359 (West 1972). DeCampos v. State Comp. Ins. Fund,122 Cal. App. 2d 519, 265 P.2d 617 (1954); Holz Rubber Co., v. American Star Ins. Co.,14 Cal. App. 3d 45, 533 P.2d 1055 (1975). Decedent made gross misrepresentations concerning her earned income and net worth on the insurance application. Decedent also concealed vital financial information from the insurer, such as her high *123 level of indebtedness. Either a misrepresentation or a concealment could have been sufficient for Hutton Life to rescind decedent's policy, even if it had not been issued illegally in violation of the California antirebate statute. Finally, we note that a party may rescind a contract if it is unlawful for causes which do not appear in its terms or conditions and if the parties are not equally at fault. Cal. Civ. Code sec. 1689(b)(5) (West 1985). Hutton Life had the defense that decedent's insurance contract was unlawful because it was issued pursuant to a rebate agreement. An unlawful contract is one which is: "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals." Cal. Civ. Code sec. 1667 (West 1985). A rebate agreement not only violates express provisions of law, such as those set forth in the California Insurance Code, but also is contrary to section 1668 of the Civil Code, which provides that "All contracts which have for their object, directly or indirectly * * * violation of law, whether willful or negligent, are *124 against the policy of the law." 17 Loyola L. Rev. at 820. Any person with a reasonable knowledge of the relevant facts concerning decedent's 30-Pay policy on the date of her death, would have been aware of the powerful defenses that Hutton Life had at its disposal concerning the validity of decedent's insurance policy. These defenses were all relevant facts concerning the valuation of decedent's claim under the policy and were ascertainable at her death. The administration of every estate involves a delay before the succession representative knows all the relevant existing facts affecting the value of the property. The Federal estate tax law is sufficiently flexible and realistic to take account of this delay. United States v. Simmons,346 F.2d 213, 217 (5th Cir. 1965). Therefore, even were we to conclude that decedent's insurance policy was not void ab initio under California law because of the antirebate statutes, which we do not, we would hold that the fair market value of decedent's contingent claim against Hutton Life on the life insurance policy was zero due to the highly remote possibility that it would have been found enforceable. (c) *125 Whether Decedent Had a Community Property Interest in Henderson's Tort Claim Against Hutton Life In his amended answer, respondent raised a new issue by claiming that one-half of the tort claim of Henderson was community property of decedent. Respondent bears the burden of proof on this issue. Rule 142(a). Respondent contends that Henderson had a viable cause of action against Hutton Life for misrepresentation at the time decedent died. Respondent further asserts that one-half of Henderson's cause of action for misrepresentation should be included in decedent's gross estate because decedent, as Henderson's spouse, had a community property interest of one-half of all property, including claims such as this, owned by Henderson at the time of her death. California Civil Code section 5110 (West 1984) provides the general rule that all personal property, wherever situated, acquired during a marriage is community property. As support for his contention that Henderson had a cause of action for misrepresentation before decedent passed away, respondent cites Henderson's Trial Brief for the California court proceeding: Huttons [sic] Life's promise to pay *126 on the policy without intending to perform, constitutes fraud for which damages lie. Cross-Complainant HENDERSON showed that he and his wife, Edith, were induced to purchase life insurance from Hutton Life upon the express promise that the proceeds would be paid in the event of death, and upon the implicit promise of Hutton, that its agents, Impaired Risk and Thomas Van Houten, were authorized to finance premium payments. Edith and John were induced by these representations of Hutton Life's agents to apply for the policies; in reliance, they purchased the insurance offer and refrained from procuring any other life insurance. The Hendersons' reliance was justifiable. They believed Thomas Van Houten and Impaired Risk had the authority to issue policies in the manner described, for Hutton Life in fact did issue the policy. Neither of the Hendersons had any knowledge that Hutton Life would later contend the policies were issued in violation of the Antirebate Provisions of the Insurance Code. "Recovery may be had for the fraud when by reason of a misrepresentation, one has sustained some pecuniary damage or injury by reason of having been put in a position worse than he would *127 have occupied had there been no fraud. A right of action accrues when a person is induced to enter into a contract by means of a fraudulent misrepresentation." R. C. Reeder Lathing Company, Inc. v. Cypress Insurance Company,3 Cal. App. 3rd 995, 84 Cal. Rptr. 98 (1970). That Hutton Life now seeks relief from the contract which it entered into, authorized, and accepted payment upon, and upon the ground that the entire arrangement it condoned was violative of the Antirebate Statute, only shows that it never intended to perform its promise to pay in the event of death, the death of a policyholder. The promise was but a fraudulent misrepresentation. Section 1709 of the California Civil Code states that, "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civ. Code Sec. 1709 (West 1985). Section 1710 defines intentional misrepresentation as: "The suggestion, as a fact, of that which is not true, by one who does not believe it to be true." Cal. Civ. Code sec. 1710 (West 1985). According to 5 Witkin, Summary *128 of Cal. Law, Torts, § 676 (1988 ed.), the following constitute elements of fraud, which give rise to the tort action for deceit: "(a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." We hold that Henderson did not have a cause of action for misrepresentation against Hutton Life at decedent's death since he did not justifiably rely on Van Houten's representations and did not sustain any resulting damages. Respondent argues that Henderson must have relied on the representations that Van Houten made to decedent (and to himself) concerning the validity of the policy because neither decedent nor Henderson went to the marketplace to purchase another one million dollar policy to take the place of the void policies. Respondent concludes that, because of Henderson's reliance, he suffered damages in the amount of one million dollars. [7]
We first point out that neither *129 Henderson nor decedent "paid" anything for the one-million dollar policies they both obtained from Van Houten. The promissory notes in decedent's name and signed by Henderson constituted a sham formulated by Henderson after decedent's death in an attempt to prove that consideration was given for the policies. Furthermore, Henderson and decedent were in marginal financial condition and were forced to borrow most of the money for their living expenses by mortgaging decedent's real property. Given their financial situation, it is highly unlikely that Henderson would have paid approximately $ 40,000 (which he would have had to borrow) to purchase a one-year, one-million dollar life insurance policy on his wife's life. Damages must be established with reasonable certainty, and must not be speculative or contingent. W. Prosser, Law of Torts 731 (4th ed. 1971). Henderson never relied upon Van Houten's representations that decedent's 30-Pay policy was valid and enforceable. It was Henderson who persuaded decedent to apply for the free policy in the first place, but only because it would enhance decedent's creditworthiness. The evidence suggests that Henderson himself had an arrangement *130 whereby Angelos would pay Henderson a bonus for each person that he persuaded to obtain a "free" million dollar policy from Angelos. Because of his involvement in this scheme, we are convinced that Henderson did not justifiably rely on the representations made by Van Houten. An essential element in recovery for misrepresentation is proof of the plaintiff's justifiable reliance on the defendant's fraudulent representations. Slakey Bros. Sacramento, Inc. v. Parker,265 Cal. App. 2d 204, 71 Cal. Rptr. 269 (1968). We find that Henderson did not have a cause of action for misrepresentation against Hutton Life under California law at decedent's death because he did not justifiably rely on the representations of Van Houten and also because he did not sustain any damages; therefore, there is no claim to add to decedent's estate. Sec. 20.2033-1(a), Estate Tax Regs. (d) Remaining Issues Our disposition of the above issues makes it unnecessary to address the remaining issues presented for decision which affect the taxable estate. All such issues presuppose that respondent will partially or completely prevail with respect to the inclusions in the taxable estate *131 which he determined in both his statutory notice and amended answer. Respondent has not prevailed with respect to either of such inclusions. Finally, respondent claims that petitioner is liable for an addition to tax pursuant to section 6651(a)(1) for failure to timely file an estate tax return. In the case of an individual dying in 1980, section 6018(a) required that the executor file an estate tax return if decedent's gross estate exceeded $ 161,000. Sec. 6018(a)(3). The only items that respondent has attempted to include in decedent's gross estate relate to amounts allegedly receivable on her insurance policy, in respondent's statutory notice, and a community property interest in her husband's alleged tort claim, in respondent's answer. We have held that neither of these items should be included in decedent's gross estate. Since respondent has not determined nor alleged any other inclusions in the taxable estate, we hold that no estate tax return was required to have been filed, and thus no addition to tax under section 6651(a) is due. To give effect to the foregoing, Decision will be entered for the petitioner.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect as of the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. In August 1980, Life of Cal changed its name to E. F. Hutton Life Insurance Company. At the time decedent and Henderson applied for insurance, the company was known as Life of Cal. Life of Cal will hereinafter by referred to as "Hutton Life" with respect to events subsequent to August 1980.↩
3. Cal. Ins. Code sec. 752 (West 1972), provides: § 752. Acceptance of rebate; misdemeanor Any person named as the insured in any policy or named as the principal, or obligee, in any surety policy or the agent or representative of any such person who, directly or indirectly, knowingly accepts or receives any unlawful rebate is guilty of a misdemeanor. ↩
4. A thorough discussion of the effect that concealment, misrepresentation and illegality have upon the validity of a life insurance contract in California follows on pages 29-30, infra.↩
5. On brief, respondent argues interchangeably that either the entire face amount ($ 1,000,000) of decedent's insurance policy should be included in the gross estate or that the amount received by decedent's children ($ 496,998) should be included in the gross estate. Respondent in American National Bank & Trust Co. v. United States,594 F.2d 1141 (7th Cir. 1979), argued, much as respondent does in this case, that the estate is required to report and pay tax on all amounts receivable under the policies, notwithstanding the contingency of their recovery. Respondent's alternative contention, that the $ 496,998 received by decedent's children is the appropriate value for decedent's insurance policy, is based upon the settlement agreement between Hutton Life and decedent's four children. Although we have concluded that decedent's policy was void, unenforceable and not included in her gross estate pursuant to sec. 2042, we nevertheless note that respondent's use of settlement agreements as evidence of the value of the claim in decedent's estate violates Rule 408 of the Federal Rules of Evidence, which provides: Rule 408. Compromise and Offers to Compromise Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. Respondent has introduced this settlement into evidence, over the pre-trial objections of petitioner, in order to prove not only Hutton Life's liability under the claim, but also the amount of the claim. This is an impermissible use of an accepted settlement as evidence. ↩
6. Respondent's claim that the amount includable in decedent's gross estate should be the proceeds "ultimately received by the beneficiaries, notwithstanding the suits between the beneficiaries," is inconsistent with respondent's interpretation of American National Bank,↩ that contested insurance claims must be valued at the date of death, not at some later time when the case is settled or ultimately tried.
7. For the reasons outlined in footnote 5, supra,↩ we decline to use evidence of Henderson's settlement with Hutton Life for any purpose in this dispute.